IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| JAMES SCEARCE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:23-cv-00012 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| PITTSYLVANIA COUNTY BOARD | ) | By:   Hon. Thomas T. Cullen |
| OF SUPERVISORS and WILLIAM | ) |       United States District Judge |
| "VIC" INGRAM, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff James Scearce ("Scearce") alleges that the Defendants Pittsylvania County Board of Supervisors ("the Board") and William "Vic" Ingram, in his personal capacity as the Board's Chair ("Ingram") (collectively, "Defendants"), deprived him of his First Amendment right to freedom of speech and falsely imprisoned him by removing him from a public hearing. This matter is now before the court on Defendants' separate motions to dismiss under different theories—the Board for failure to state a claim, and Ingram for improper service and for failure to state a claim. (ECF Nos. 4, 6.) The motions have been fully briefed and are ripe for decision. Having considered the pleadings, briefs, and arguments at the motions hearing, the court will grant the Board's motion and grant in part and deny in part Ingram's motion.

## I.   BACKGROUND

On November 15, 2022, Scearce attended the Board's monthly public meeting, as was his right as a resident of Pittsylvania County. (Compl. ¶¶ 1, 6 [ECF No. 1]; November Meeting

Video,[1] at 31:36 (Pittsylvania Cnty. 2023) [hereinafter Video].) About 30 minutes into the meeting, the Board held its "Hearing of the Citizens," inviting residents to make public comments addressing various topics. (Video at 31:25; Compl. ¶ 11.) At the outset of the Hearing of the Citizens, Ingram, as chair of the Board, recited rules for that portion of the meeting:

> I will tell you uncategorically [*sic*] that [the rules] will be enforced tonight. Each person addressing the Board under the Hearing of the Citizens . . . shall limit his or her address to three minutes . . . . All remarks shall be addressed to the Board as a body and not to any individual member thereof.

(Video at 31:28) Following Ingram's announcement, the Hearing of the Citizens was opened for comments from those who wished to speak.

Scearce was the first citizen to speak and, reading from prepared remarks, said, "Tonight I would like to talk about the [Board] chairman's favorite special interest group, fire and rescue agencies." (Video at 32:40; Compl. ¶ 15.) Ingram immediately interjected, saying, "That is it, Mr. Scearce, your time is up, sit down, sir. Mr. Scearce, sit down please." (Video at 32:48.) But Scearce continued speaking on the topic, so Ingram directed sheriff's deputies to "escort him out" of the meeting. (Video at 32:58; Compl. ¶ 18.) Scearce persisted, and Ingram instructed technical staff to "kill" Scearce's microphone. (Video at 33:04; Compl. ¶ 19.) Ingram then instructed deputies: "If he will not leave, go ahead and charge him with trespassing." (Video at 33:19; Compl. ¶ 20.) While Scearce was still speaking, sheriff's deputies grabbed him

---

[1] The video of the hearing, as referenced in the Complaint, is available at https://www.facebook.com/pittsylvaniacountyva/videos/1311575136333440/.

by the arms and escorted him out of the meeting. (Compl. ¶¶ 21–22.) In all—including while Ingram was speaking over him—Scearce spoke for approximately one minute. (*Id.* ¶ 29.)

As deputies escorted Scearce out of the meeting, Ingram stated:

> Mr. Scearce, I warned you before you stood up that we have conditions by which people are gonna [*sic*] speak. For the citizens present, for eight of the ten months he has stood before us and attacked one of us or all of us, and I just read this disclaimer and it's not fair to let anybody abuse this process. It has nothing to do with the First Amendment. You cannot run into a movie theater and yell "fire" and you cannot stand up in a courthouse and disrupt the service, and you're not gonna [*sic*] disrupt our meeting, so he was forewarned.

(Video at 33:39.)

Scearce alleges that Ingram had prearranged with the county sheriff to have additional deputies present to escort him from the meeting. (Compl. ¶ 26.) Scearce also contends that, before the meeting, Ingram advised a fellow Board member, Robert Warren, that he intended to remove Scearce from the meeting if he attempted to speak. (*Id.* ¶ 27.) The following day, a local newspaper published a photograph of a deputy and the sheriff escorting Scearce out of the meeting, identifying Scearce in the caption. (Chatham Star Tribune, Nov. 16, 2022, at 12A [ECF No. 1-2].)

Following these events, Scearce filed this action asserting that Defendants violated his First Amendment rights and falsely imprisoned him, in violation of 42 U.S.C. § 1983 and Virginia law.[2] Defendants timely moved to dismiss. (*See* ECF Nos. 4, 6.) Ingram requests

---

[2] Scearce, through counsel, expressly abandoned his false imprisonment claim in his briefing and at the hearing. (*See* ECF No. 9 at 9; ECF No. 10 at 9.) The court may dismiss an uncontroverted claim when a plaintiff "abandoned th[at] portion of [his] claim, both through [his] express disavowal and by failing to respond to [a defendant]'s argument." *Fravel v. Ford Motor Co.*, 973 F. Supp. 2d 651, 654 (W.D. Va. 2013); *see Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir. 2004). Here, Scearce expressly "concede[d] that, with regard to his claim for false imprisonment, it is likely that Defendants are both covered by Virginia's sovereign immunity," and

dismissal under Fed. R. Civ. P. 12(b)(4)–(6)[3]; the Board only relies on 12(b)(6).

## II.    STANDARDS OF REVIEW

### A.  12(b)(5) Standard

A 12(b)(5) motion to dismiss challenges the adequacy of Plaintiff's service of process, contending that the purported service fell short of Fed. R. Civ. P. 4's requirements. *See Brown-Thomas v. Hynie*, 367 F. Supp. 3d 452, 461 (D.S.C. 2019). "The plaintiff bears the burden of proving adequate service once a motion to dismiss for insufficient service of process has been filed pursuant to Fed. R. Civ. P. 12(b)(5)." *Scott v. Md. State Dep't of Labor*, 673 F. App'x 299, 304 (4th Cir. 2016). If a defendant receives "actual notice of the commencement of the action and the duty to defend . . . , the provisions of Rule 4[] should be liberally construed to effectuate service . . . ." *Karlsson v. Rabinowitz*, 318 F.2d 666, 668 (4th Cir. 1963). But actual notice does not cure all; "the rules are there to be followed, and plain requirements for the

---

abandoned the claim by failing to respond to Defendants' arguments about the merits of a false imprisonment claim. (ECF No. 9 at 9; ECF No. 10 at 10.) On this basis only, the false imprisonment claim will be dismissed as to both Defendants.

Scearce's concession on this point is puzzling, as it is the court's understanding of Virginia law that while the Board is likely shielded from intentional tort liability, that same sovereign immunity may not extend to Ingram. *See, e.g.*, *Harrison v. Prince William Cnty. Police Dep't*, 640 F. Supp. 2d 688, 712 (E.D. Va. 2009) (citing *Elder v. Holland*, 208 Va. 15, 18–19 (1967)); Va. Code Ann. § 15.2-1405.  But insofar as Scearce expressly abandons this claim, the court will not consider it further.

[3] Ingram moves to dismiss for improper service under both Rules 12(b)(4) and 12(b)(5), but his argument focuses on Scearce's failure to serve a summons along with the complaint (Ingram Mem. Supp. Mot. Dismiss. at 3–4 [ECF No. 4],) and that subsequent attempts to cure fell short of Rule 4 (Ingram Reply at 1–5 [ECF No. 12]). "Rules 12(b)(4) and 12(b)(5) are often confused. Rule 12(b)(4) concerns the sufficiency of the form of the process, rather than the manner or method by which it is served. Rule 12(b)(5), on the other hand, challenges the mode of delivery or the lack of delivery of the summons and complaint." *Davies v. Jobs & Adverts Online, GMBH*, 94 F. Supp. 2d 719, 721 n.5 (E.D. Va. 2000). Here, Ingram challenges the lack of delivery of the summons and then the manner of service of that summons. His "motion is properly construed as a motion for dismissal under Rule 12(b)(5)." *Id.* (cleaned up); *see also* 5B Charles Alan Wright & Arthur D. Miller, *Federal Practice and Procedure* § 1353 (3d ed. 2004) ("An appropriate objection under Rule 12(b)(5) *would be the nonreceipt by the defendant of a summons . . .* or *any other failure to comply with the procedural requirements in the applicable service provisions.*") (emphasis added).

means of effecting service of process may not be ignored." *Armco, Inc. v. Penrod-Stauffer Bldg. Sys., Inc.*, 733 F.2d 1087, 1089 (4th Cir. 1984). Ultimately, the court has broad discretion in deciding a 12(b)(5) motion. *See Scott*, 673 F. App'x at 304.

## B. 12(b)(6) Standard

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While a complaint does not need "detailed factual allegations," complaints merely offering "labels and conclusions," "naked assertions devoid of 'further factual enhancement,'" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (cleaned up) (quoting *Twombly*, 550 U.S. at 555, 557). At bottom, the court "must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Langford v. Joyner*, 62 F.4th 122, 124 (4th Cir. 2023).

### III.   ANALYSIS

## A.  Service of Process

Ingram moves to dismiss for improper service of process under Fed. R. Civ. P. 12(b)(5).

Service of process in federal courts is proper if it complies with Rule 4. *See* Fed. R. Civ. P. 4. A plaintiff must arrange for service of both the complaint and the summons on all defendants. *Id.* 4(c)(1). Such service may be made by "[a]ny person who is at least 18 years old

and not a party . . . ." *Id.* 4(c)(2). The method of process can be achieved *either* by following state law *or* by the specific processes laid out in Rule 4(e)(2), including physical service on the defendant. *Id.* 4(e)(2)(A). Service must be completed within 90 days of when the complaint is filed, unless good cause is shown. *Id.* 4(m).

Ingram first argues Scearce's service of process was defective because initial service did not include a copy of the summons along with the complaint. (Ingram Mem. Supp. Mot. Dismiss at 4 [ECF No. 4].) Four days after Ingram filed this motion, in an apparent attempt to cure this initial defect, Scearce's attorney personally delivered a copy of the summons to both Defendants. (*See* Aff. Service [ECF No. 11-1].) Because Ingram received actual notice, the court construes Rule 4 liberally to effectuate service. *See Karlsson*, 318 F.2d at 668.

Scearce filed his complaint on May 11, 2023, and attempted to serve process on Ingram on June 30, 2023. (Ingram Decl. ¶ 2 [ECF No. 4-1].) Though Scearce's initial service was defective in that it included only a complaint, he cured that defect by serving both the complaint and the summons on July 18, 2023, well within the 90-day time period set out by Rule 4. Aff. Service; Fed. R. Civ. P. 4(m); *see, e.g.*, *Henderson v. United States*, 517 U.S. 654, 663 (1996) ("The Federal Rules thus convey a clear message: Complaints are not to be dismissed if served within [Rule 4(m)'s time period], or within such additional time as the court may allow.").

Ingram next contends that service was improper under Rule 4(c)(2) because Scearce's counsel personally served the summons. (Ingram Reply at 2–5 [ECF No. 12].) Rule 4's plain language makes clear that "[a]ny person who is at least 18 years old and not a party may serve a summons and complaint." Fed. R. Civ. P. 4(c)(2). An attorney for a plaintiff is not prohibited

from serving process by the Rule's plain meaning, and the court will not "read limitations onto the clear wording" of Rule 4. *Jugolinija v. Blue Heaven Mills, Inc.*, 115 F.R.D. 13, 15 (S.D. Ga. 1986); *see also Stark v. Town of Rumford*, No. 2:20-cv-00066-JDL, 2020 WL 6389185, at *4 (D. Me. Oct. 30, 2020) (collecting cases to show that service by a party's attorney, "though perhaps not best practice, is commonly treated as proper under Rule 4(c)(2), despite the obvious conflict of interest"). Because Scearce's attorney is not a party to the case and otherwise qualifies to serve process under Rule 4(c)(2), he is not prohibited from doing so under federal law.

Next, Ingram asks the court to disregard the Federal Rules of Civil Procedure in favor of Virginia's service rule, which Ingram claims would render service improper. (*See* Ingram Reply at 2.) Ingram points to Rule 4(e)(2) for this authority, as that rule provides that service is also proper if process is served as prescribed by Virginia law. Under Virginia law, personal service by Scearce's attorney would likely be improper because service may only be made by "[a]ny person 18 years of age or older and who is not a party or otherwise interested in the subject matter in controversy."[4]  Va. Code Ann. § 8.01-293(A)(2). As Scearce's attorney, he undoubtedly has an interest in the subject matter in controversy.

---

[4] Ingram cites generally to the Virginia Rules of Professional Conduct and a case discussing conflicts of interest but does not point to any legal authority that establishes a party's attorney is "interested in the subject matter in controversy" under Va. Code Ann. § 8.01-293. (*See* Ingram Reply at 2.) The court found one case in which the Virginia Supreme Court, in dicta, noted that an attorney "was an interested party to the suit by reason of his attorneyship," and "deprecate[d] the action of counsel in serving process . . . ." *Horne v. Osborne*, 163 Va. 235, 238–39 (1934).

But Ingram confuses the option to serve a summons in accordance with Virginia's law in federal court with a requirement to do so that would supplant the rest of Rule 4.[5] *See Boahen v. Trifiletti*, No. 3:18-cv-00171, 2019 WL 688412, at *5 (D. Conn. Feb. 19, 2019) ("Nowhere does [Rule 4] state that a party may rely on a state's definition of process to supplant the very thorough requirements for the summons laid out in subsections (a), (b), and (c)."). In effect, Rule 4(e) states that service can be made *either* by following the relevant state law *or* following the methodology provided for in 4(e)(2). *See* 4B Charles Alan Wright & Arthur D. Miller, *Federal Practice and Procedure* § 1112 (4th ed. 2018). Scearce's attorney served Ingram personally, therefore complying with Fed. R. Civ. P. 4(e)(2)(A).

For these reasons, Ingram's motion to dismiss for improper service will be denied.

## B. Alleged First Amendment Violations (Count I):

Scearce filed his complaint alleging violations under 42 U.S.C. § 1983. Section 1983 creates a private cause of action against anyone

> who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . .

42 U.S.C. § 1983. To state a cause of action under Section 1983, Scearce must allege facts that, if true, would show that he has (1) been deprived of rights guaranteed by the Constitution or laws of the United States, and (2) that the deprivation resulted from conduct committed by a person

---

[5] The court understands Ingram's confusion to an extent, as Scearce's attorney's affidavit tracks nearly identically the language of the Virginia service law. (*See* Aff. Service ("I am not a party to, *or otherwise interested in the subject matter in controversy in this case* . . . .") (emphasis added).) But that does not disturb the axiom that "in actions arising under federal law, . . . the manner and timing of serving process are generally nonjurisdictional matters of 'procedure' controlled by the Federal Rules." *Henderson*, 517 U.S. at 656.

acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Liability under § 1983 is "personal, based upon each defendant's own constitutional violations." *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Here, Scearce asserts a § 1983 claim alleging violations of his First Amendment rights to freedom of speech and to petition the government for redress. Scearce contends that Ingram—who was indisputably acting under color of law[6]—denied him these rights when Ingram directed sheriff's deputies to escort him out of the meeting after engaging in political speech. Scearce also alleges that the Board violated the same rights by "allow[ing] Ingram to impose the deprivation" on him. (Compl. ¶ 45.)

### 1. Ingram's Alleged First Amendment Violation

Ingram argues that, because Scearce was properly dismissed from the hearing after failing to follow the established rules of a limited public forum, Scearce has failed to allege a violation of his First Amendment rights. (Ingram Mem. Supp. Mot. Dismiss. at 5–6.) The court disagrees and will deny Ingram's motion on this count.

In assessing whether a First Amendment violation has occurred in this context, the court must determine: (1) "whether the plaintiff has engaged in 'protected speech'"; (2) "'the nature of the forum, because the extent to which the Government may limit access depends on'" that classification; and (3) "'whether the justifications for exclusion from the relevant forum satisfy the requisite standard.'" *Goulart v. Meadows*, 345 F.3d 239, 246 (4th Cir. 2003) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).

---

[6] Scearce asserts that Ingram's actions at the meeting satisfy this threshold by virtue of Ingram's role as the Board's chairman. Ingram has not contested this prong, and the court agrees that he acted under color of state law. (*See* Ingram Mem. Supp. Mot. Dismiss. at 5–7.)

### i.     Protected Speech

The court must first consider whether Scearce's speech was protected. A citizen's "expression on public issues . . . 'rest[s] on the highest rung of the hierarchy of First Amendment values.'" *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)). Accordingly, "speech on matters of public concern" merits "the core of First Amendment protection . . . ." *Engquist v. Or. Dept. of Agric.*, 553 U.S. 591, 600 (2008).

Scearce's speech attempting to highlight Ingram's "favorite special interest group" in the context of a Board of Supervisors meeting was clearly protected speech. (Compl. ¶ 36.) Speech on public matters "should be uninhibited, robust, and wide-open, and that . . . may well include . . . attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Public discussion on the qualifications of a government official or his fitness for office is accepted political speech. *See McIntyre v. Ohio Elections Comm'n.*, 514 U.S. 334, 346 (1995). After all, "[t]he very essence of free political speech is the right to criticize an existing regime . . . ." *Castle v. Colonial Sch. Dist.*, 933 F. Supp. 458, 464 (E.D. Pa. 1996). It follows that Ingram's removal of Scearce for his criticisms of the "Board member['s] official actions . . . renders the banning all the more problematic as such speech 'occupies the core of the protection afforded by the First Amendment.'" *Davison v. Randall*, 912 F.3d 666, 688 (4th Cir. 2019) (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 521 (4th Cir. 2003)).

As this court has previously noted, speech criticizing a local regime on a matter of public concern "falls squarely within the ambit of First Amendment protection." *Scarborough*

*v. Frederick Cnty. Sch. Bd.*, 517 F. Supp. 3d 569, 576 (W.D. Va. 2021). Scearce's comments are paradigmatic of protected speech and thus merit the First Amendment's robust protections.

### ii.    Nature of the Forum

But "even protected speech is not equally permissible in all places and at all times." *Snyder v. Phelps*, 562 U.S. 443, 456 (2011) (cleaned up). The standards the court applies to determine whether the Board unconstitutionally restricted Scearce's speech depend on the nature of the forum. *Steinburg v. Chesterfield Cnty. Plan. Comm'n*, 527 F.3d 377, 384 (4th Cir. 2008). In conducting this forum analysis, the Supreme Court "sort[s] government property into three categories[:]" traditional, designated, and limited public fora.[7] *Christian Legal Soc'y Chapter of the Univ. of Cal, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 679 n.11 (2010).

Freedom of speech is strongest in a traditional public forum. *Steinburg*, 527 F.3d at 384. "In the traditional public forum, which includes . . . general meeting halls, speakers' rights are at their apex. . . . [A]ny government-imposed restrictions on their speech" must be: 1) "reasonable time, place and manner restrictions;" 2) "content-neutral;" and 3) "narrowly tailored to serve a significant governmental interest." *Id.* (cleaned up).

Speech in a designated public forum merits the same level of protection as it does in a traditional public forum, insofar as any restrictions must satisfy strict scrutiny. *Pleasant Grove City v. Summum*, 555 U.S. 460, 469–70 (2009). "A governmental entity creates a designated public forum when 'government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose.'" *Sammons v. McCarthy*, 606 F. Supp. 3d 165,

---

[7] A fourth category—the nonpublic forum—exists in forum analyses more generally and is "not open by tradition or designation to the public for expressive activity." *Goulart*, 345 F.3d at 248.

211 (D. Md. 2022) (quoting *Christian Legal Soc'y*, 561 U.S. at 661 n.11) (cleaned up). "If the government excludes a speaker who falls within the class to which a designated public forum is made generally available," that forum will be treated as traditional. *Goulart*, 345 F.3d at 249–50 (cleaned up). Put another way, in a designated public forum, the government "cannot . . . open a meeting to the public and then prohibit" an individual from speaking "simply because of . . . what . . . [he] . . . wish[es] to say." *Hickory Fire Fighters Ass'n v. City of Hickory*, 656 F.2d 917, 922 (4th Cir. 1981).

Last, the "limited public forum is established when the government property is 'limited to use by certain groups or dedicated solely to the discussion of certain subjects.'" *Sammons*, 606 F. Supp. 3d at 212 (quoting *Pleasant Grove City*, 555 U.S. at 470). In this forum, the government "may impose restrictions on speech that are reasonable and viewpoint neutral." *Pleasant Grove City*, 555 U.S. at 470.

Here, Ingram asserts—and Scearce does not contest—that the Board's November meeting was a limited public forum, so the court assumes the same.[8]

---

[8] Even so, the court notes that, at least with regard to the "Hearing of the Citizens" portion of the November Meeting, the Board's "three-minute-per-speaker open mic period" that allowed citizens to voice their concern on any topic created "a gaping forum[]" that skews closer to a traditional or designated public forum. *Draego v. City of Charlottesville*, No. 3:16-cv-00057, 2016 WL 6834025, at *14 (W.D. Va. Nov. 18, 2016) (positing that an open public comment period within an otherwise limited public forum may qualify as a traditional forum) (cleaned up).

"Courts have provided conflicting guidance on whether 'limited public forum' is (1) a synonym for or subtype of 'designated public forum'; (2) a synonym for 'nonpublic forum'; or (3) a completely separate fourth category." *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 196 n.13 (4th Cir. 2022). This distinction "has bedeviled federal courts." *Am. Freedom. Def. Initiative v. King Cnty.*, 136 S. Ct. 1022, 1022 (2016) (Thomas, J., dissenting from denial of cert.).

The Fourth Circuit analyzed the distinction between designated and limited public fora in *Warren v. Fairfax County*, 196 F.3d 186 (4th Cir. 1999) (en banc). There, the court "treated the terms . . . as two names for the same forum" and used them interchangeably. *Goulart*, 345 F.3d at 250. *Warren* instructed courts facing a designated/limited public forum to determine whether an "internal standard" or "external standard" applied. *Id.* The result of that determination guided how the court would review the challenged restriction: an internal standard applied to situations which are now recognized as designated public forums and had to survive strict

### iii.     Justifications for Exclusion from the Forum

"An official overseeing a limited public forum 'is justified in limiting its meeting to discussion of specified agenda items and in imposing reasonable restrictions to preserve civility and decorum necessary to further the forum's purpose of conducting public business.'" *Bhattacharya v. Murray*, No. 3:19-cv-00054, 2022 WL 2873176, at *3 (W.D. Va. July 21, 2022) (quoting *Steinburg*, 527 F.3d at 385). But just as citizens must follow these reasonable restrictions, so too must the government: "Once it has opened a limited forum . . . the State must respect the lawful boundaries it has itself set." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). Content discrimination may be tolerable in a limited public forum if reasonable, but "viewpoint discrimination . . . is presumed impermissible when directed against speech otherwise within the forum's limitations." *Rosenberger*, 515 U.S. at 830. And a chairman's "decision to ban" an individual from a limited public forum "because of his allegation of governmental corruption constitutes black-letter viewpoint discrimination." *Davison*, 912 F.3d at 687.

Ingram claims that removing Scearce was justified because he violated the Board's rules against addressing Board members individually. (Ingram Mem. Supp. Mot. Dismiss at 5–6.) In doing so, Ingram relies on the Fourth Circuit's holding in *Steinburg*, 527 F.3d 377. While it is true that the Fourth Circuit held in that case that a policy against "personal attacks" was not

---

scrutiny, while an external standard applied to situations which are recognized as limited public forums and passed constitutional muster if the restrictions were viewpoint neutral and reasonable. *See id.*

In this case, however, the court "need not wade into this morass" as the facts alleged state a claim for a First Amendment violation regardless of whether the Hearing of the Citizens was a limited or designated public forum. *White Coat Waste Project*, 35 F.4th at 196 n.13; *see also Scarborough*, 517 F. Supp. 3d at 577 ("Viewpoint discrimination . . . is prohibited in all forums.") (cleaned up).

facially unconstitutional,[9] *id.* at 387, Scearce does not claim the Board's rules are facially unconstitutional; he instead asserts that Ingram's application of the rule was in effect viewpoint discrimination. (Scearce Mem. Opp'n Mot. Dismiss at 7 [ECF No. 10].) And naturally, *Steinburg* "does not preclude a challenge premised on misuse of the policy to chill or silence speech in a given circumstance." 527 F.3d at 387.

The facts, as alleged, state a claim for an unconstitutional application of the rule to silence Scearce. While reading from his statement, Scearce informed the Board that he "would like to talk about the [Board] chairman's favorite special interest group, fire and rescue agencies." (Video at 32:40.) Ingram directed Scearce to sit down after just eight seconds (making his claim that Scearce's "time was up" indisputably false) and, after Scearce continued reading, directed his microphone to be silenced and for him to be escorted out of the meeting. Unlike in *Steinburg*, the Chairman here *did* invoke the Board's equivalent of a "policy against personal attacks" in removing Scearce, and Ingram did not offer any other legitimate reason for his removal. 527 F.3d at 387–88. The facts alleged, taken as true, support an inference that Ingram's decision to silence Scearce's otherwise permissible speech was based on the content of the speech and therefore would constitute viewpoint discrimination.

At this early stage, therefore, taking the facts as true and making all inferences in Scearce's favor, he has adequately alleged that Ingram planned to remove him from the meeting and successfully did so, because he expressed an opinion Ingram did not like. The

---

[9] The court notes that the forum in *Steinburg* was considerably narrower than the one here. *Steinburg* involved a public comment period on a specific topic; the Hearing of the Citizens lacked any specific subject matter. *See Draego*, 2016 WL 6834025 at *14.

court finds that Scearce has sufficiently alleged a claim for violation of his First Amendment right to free speech.

### 2.  The Board's Alleged First Amendment Violation

The Board argues that the court must dismiss the Section 1983 claim against it because it is not a proper defendant under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The court agrees and will grant the Board's motion to dismiss.

The crux of Scearce's argument is that the Board is liable insofar as it acquiesced in its chairman's decision to expel Scearce from the November meeting. (Compl. ¶ 53.) But "municipal liability under Section 1983 does not amount to respondeat superior." *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 469–70 (4th Cir. 2013). "Municipalities are responsible only for 'their *own* illegal acts.'" *Howard v. City of Durham*, 68 F.4th 934, 952 (4th Cir. 2023) (emphasis in original) (quoting *Pembaur v. City of Cincinatti*, 475 U.S. 469, 479 (1986)). In making out a Section 1983 claim against a local government,[10] Scearce may do so "only under the stringent test of *Monell*." *Collinson v. Gott*, 895 F.2d 994, 1004 (4th Cir. 1990) (Phillips, J. concurring) (cleaned up).

"*Monell* permits suits against a municipality for a federal constitutional deprivation only when the municipality undertook the allegedly unconstitutional action pursuant to an 'official policy' or 'custom.'" *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 532–33 (4th Cir. 2022) (quoting *Monell*, 436 U.S. at 690–91).  The requisite policy or custom can arise in one of four ways:

---

[10] Though the County of Pittsylvania is not a municipality under Virginia law, *see generally* Va. Code Ann. § 15.2-102, *Monell* liability extends to a county's local form of government., *see Santos*, 725 F.3d at 469.

> (1) through an express policy, such as a written ordinance or
> regulation; (2) through the decisions of a person with final
> policymaking authority; (3) through an omission, such as a failure
> to properly train officers, that "manifest[s] deliberate indifference
> to the rights of citizens"; or (4) through a practice that is so
> "persistent and widespread" as to constitute a "custom or usage
> with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)). Scearce claims the Board engaged in unconstitutional action through the second and fourth avenues above, so the court considers those in turn.

### i. Decisions of a person with final decision-making authority

A single decision by a policymaker can give rise to municipal liability, but only when "the policymaker has *final* authority to establish policy regarding the action that was ordered." *Fuller v. Carilion Clinic*, 382 F. Supp. 3d 475, 492 (W.D. Va. 2019) (emphasis in original); *see also Hunter v. Town of Mocksville*, 897 F.3d 538, 554 (4th Cir. 2018) (calling this the court's "touchstone inquiry"). Discretion to make decisions is not, by itself, enough: "[P]olicymaking authority implies authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government." *Spell v. McDaniel*, 824 F.2d 1380, 1386 (4th Cir. 1987) (cleaned up). Ultimately, "whether a particular official has final policymaking authority is a question of state law." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (cleaned up).

Under Virginia law, the Board of Supervisors is "the policy-determining body of the county[,]" not its chair. Va. Code Ann. § 15.2-403. In other words, the Board as a whole has the power to make final policy; individual members—even its chair—do not. *See Davison v. Loudon Cnty. Bd. of Supervisors*, No. 1:16-cv-00932, 2016 WL 4801617, at *5 (E.D. Va. Sept. 14,

- 16 -

2016), *aff'd sub nom. Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019) ("It does not appear that individual Board members are authorized to take such action on behalf of the Board as a whole.") (citing Va. Code Ann. § 15.2-400, *et seq.*). Ingram is not a final policymaker under Virginia law.

Alternatively, Scearce contends that the Board, as the municipal governing body and final policymaker, delegated that authority to Ingram and ratified his action with silence after Ingram removed Scearce from the meeting. While such a theory is cognizable, ratification of a delegated act requires more than mere knowledge and acquiescence. *See Ashby v. Isle of Wight Cnty. Sch. Bd.*, 354 F. Supp. 2d 616, 627–28 (E.D. Va. 2004) (collecting cases for the notion that, "in addition to having knowledge of the subordinate's action, the final policymaker must somehow actively assist the subordinate or participate in administering the action as policy"). And a board chairman's unilateral decision to ban a citizen from a public forum is not a final policy of the Board itself. *See Davison v. Randall*, 912 F.3d 666, 690 (4th Cir. 2019) (affirming that the Chairman did not act with final decision-making authority when she blocked a citizen from her Facebook page).

Even viewing the facts in the light most favorable to Scearce,[11] the Board "[s]imply going along with discretionary decisions made by [Ingram] . . . is not a delegation to [him] of the authority to make policy." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988). The court

---

[11] The closest Scearce gets to stating a ratification claim is his allegation that Ingram met with another Board member, Robert Warren, and told him of his plan to remove Scearce from the meeting if he attempted to speak. (Compl. ¶ 27.) Still, Scearce does not allege that Warren did anything more than listen to Ingram. (*Id.*) And even if it were alleged that Warren did more than just listen, an action by two out of seven Board members would likely not be enough to create a policy that would give rise to *Monell* liability. *See generally* Va. Code Ann. § 15.2-400, et seq; *see also Campbell v. Rainbow City*, 434 F.3d 1306, 1313 (11th Cir. 2006) (collecting cases to show a majority needs to have unconstitutional motive to impute it to the rest of a local government council).

is "unpersuaded by [Scearce's] argument that the other . . . Board members tacitly agreed with [Ingram's] decision by not speaking out against [him], and that such inaction by the other members subjects the . . . Board to municipal liability." *Liggins v. Clarke Cnty. Sch. Bd.*, No. 5:09-cv-00077, 2010 WL 3664054, at *5 (W.D. Va. Sept. 17, 2010)) The law simply requires more than that.

In sum, Scearce fails to state a claim of *Monell* liability stemming from a decision of a person with final policymaking authority, whether through Ingram's inherent power as the Board's Chair, or under a theory of delegation and ratification.

### ii. Through a practice so persistent that it constitutes a custom or usage with the force of law

Scearce next asserts that application of a rule that "forbade members of the public from addressing a [Board] member directly" amounted to an unconstitutional "custom or usage with the force of law." (ECF No. 9, at 5.) "To prove a custom or practice using the fourth method, he must show that a 'pattern of comparable practices has become actually or constructively known to responsible policymakers.'" *Howard*, 68 F.4th at 952 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987)). "Prevailing under such a theory is no easy task . . . because sporadic or isolated violations of rights will not give rise to *Monell* liability; only widespread or flagrant violations will." *Id.* at 953 (cleaned up). And one decision by the chairman does not a pattern make. *Accord Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (noting a custom or pattern arises in this manner only "if a practice is so 'persistent and widespread' and 'so permanent and well settled'") (quoting *Monell*, 436 U.S. at 691).

Scearce's challenge on this ground is premised on the notion that the Board's application of its rule amounts to an unconstitutional policy that chills its citizens' speech.[12] But as Scearce alleges in his complaint, the constitutional violation was not the Board following its own unconstitutional rules; it was that Ingram was engaging in viewpoint discrimination by removing Scearce from the meeting when he had not broken those rules. (*See* Compl. ¶ 50.) Put simply, the Board is not liable for maintaining a widespread policy of removing people based on viewpoint because it did not have such a policy. *As Scearce states*, "No other citizen was escorted from the meeting, or denied opportunity to express political views by Defendants." (Compl. ¶ 30); *see Liggins*, 2010 WL 3664054, at *5 ("There is no evidence that the . . . Board, as an entity, embraced any policy of silencing citizens at public meetings . . . ."). And "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish . . . the requisite fault on the part of the municipality . . . ." *City of Ok. City v. Tuttle*, 471 U.S. 808, 824 (1985). Scearce's allegations fail to reach this burden.

To the extent that Scearce's argument can be construed as a facial challenge to the rules, the court doubts that such a rule is facially unconstitutional. It is the binding law of the Fourth Circuit that "a content-neutral policy against personal attacks is not facially unconstitutional insofar as it is adopted and employed to serve the legitimate public interest in a limited forum of decorum and order."[13] *Steinburg*, 527 F.3d at 387; *see also Davison v. Rose*,

---

[12] Scearce acknowledged at the hearing that he does not challenge the rule's constitutionality on its face.

[13] Scearce contends that *Steinburg's* viability is questionable after *Reed v. Town of Gilbert*, 576 U.S. 155 (2015) and its progeny's guidance on content-neutrality. This argument might hold water in other circuits. *See, e.g., Ison v. Madison Local Sch. Dist. Bd. Educ.*, 3 F.4th 887, 895 (6th Cir. 2021) (reversing a 2009 case, holding a policy that restricted "'personally directed' speech" in a limited public forum was facially unconstitutional in light of recent

19 F.4th 626, 635 (4th Cir. 2021) (affirming *Steinburg*'s reasoning by upholding a similar policy that did "not allow comments 'that are harassing or amount to a personal attack against any identifiable individual,' including . . . board members"). Therefore, the court next considers whether the rule is content-neutral.

In determining whether a restriction is content-neural, the court begins "by considering whether the [regulation] 'applied to particular speech because of the topic discussed or the idea or message expressed.'" *Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016) (cleaned up) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

The Board's rule is content neutral if applied correctly. "To know whether the rule applies," the court need not "assess whether speech has [a certain] character." *Draego*, 2016 WL 6834025, at *16. Instead, the relevant inquiry is whether the citizen directly spoke to a Board member.[14] *See Miller v. Gorgin*, No. 22-cv-3329, 2023 WL 3294832, at *12 (E.D. Pa. May 5, 2023) (finding a nearly identical rule to be facially content and viewpoint neutral because it "permits speakers to make comments and express opinions *about* individual board members; it merely requires that those comments be *addressed* to the presiding officer") (emphasis in original). In theory, the rule permits a Pittsylvania citizen from directing either praise or scorn towards any individual member of the Board, so long as he or she addresses that message to the Board as a whole. *Contra Draego*, 2016 WL 6834025, at *16 (finding a general

---

Supreme Court precedent). But the Fourth Circuit recently affirmed its holding and reasoning in *Steinburg*. *See Davison v. Rose*, 19 F.4th 626, 635–36 (4th Cir. 2021).

[14] Ingram appears to invoke this rule properly on the very next speaker. Towards the end of her address, the next citizen directly welcomes a new Board member and outlines her hopes for his term. Ingram applies the rule, interrupting her, stating, "We've asked you not to address any specific member . . . ." (Video at 38:45.)

- 20 -

anti-defamation policy in a public comment period was facially content-based and unconstitutional because one had to consider the character of the speech).

The only constitutional issue with such a rule, therefore, would be its improper application. But a chairman's erroneous interpretation and enforcement of an otherwise valid rule does not impute liability to the Board. *See, e.g.*, *Tuttle*, 471 U.S. at 823 ("[S]ome limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional, or the test set out in *Monell* will become a dead letter.").

In advancing his claim against the Board, Scearce "misses a foundational principle of *Monell* liability—that municipalities are liable only for 'acts which *the municipality* has officially sanctioned or ordered.'" *Howard*, 68 F.4th at 954 (emphasis in original) (quoting *Pembaur*, 475 U.S. at 480). At bottom, Section 1983's purpose when applied to local governments is to "hold[] municipalities accountable for the 'actions for which the municipality is actually responsible.'" *Starbuck*, 28 F.4th at 534 (quoting *Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000)) (cleaned up). Scearce does not allege facts that, if true, would establish that the Board as a whole is actually responsible for the alleged transgressions against him. Accordingly, the court will grant the Board's motion to dismiss.

## IV.   CONCLUSION

For these reasons, the Board's motion to dismiss will be granted, and Ingram's motion to dismiss will be granted as to Count 2 (false imprisonment) but denied as to Count 1 (First Amendment violation).

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 19th day of September 2023.

/s/ Thomas T. Cullen
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE